UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No.  13-cv-04909-JST

In re MELLANOX TECHNOLOGIES LTD.
SECURITIES LITIGATION

**ORDER GRANTING DEFENDANTS'
MOTION TO DISMISS FIRST
AMENDED COMPLAINT**

In this securities fraud suit, Defendants Mellanox Technologies LTD ("Mellanox"), its co-founder and current Chief Executive Officer ("CEO") Eyal Waldman ("Waldman"), its former Chief Financial Officer ("CFO") Michael Gray ("Gray"), and its former Vice President of Finance and current CFO Jacob Shulman ("Shulman"), move to dismiss the complaint for failure to state a claim under the pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  Because the Amended Complaint fails properly to plead materiality, falsity, and scienter, the Court grants Defendants' motion to dismiss with leave to amend.

## I.    BACKGROUND

Lead Plaintiffs allege in their Amended Complaint, ECF No. 53 ("AC"), that Mellanox and several of the company's current and former executives committed securities fraud in violation of sections 10(b) and 20(a) of the Security Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), 78(t)-1, and Rule 10b-5 promulgated thereunder by the Securities Exchange Commission ("SEC"), 17 C.F.R. § 240.10b-5.  Plaintiffs bring this action on behalf of a class of purchasers of Mellanox common stock who purchased shares between April 19, 2012, and January 2, 2013 (the "Class Period").

### A.    Nature of Mellanox's Business

United States District Court
Northern District of California

Mellanox, an Israeli company with its principal place of business in Sunnyvale, California, designs, manufactures, and sells interconnect products for computing, storage, and communications applications.  AC ¶ 2.  Mellanox's products facilitate data transmission between servers, storage systems, communications infrastructure equipment, and embedded systems.  Id.  Mellanox sells its products to a very small number of customers, called original equipment manufacturers ("OEMs"), who, in turn, incorporate Mellanox's products into their own server, storage, and communications infrastructure systems.  Id.  A small number of OEMs, including Hewlett-Packard ("HP"), IBM, and Dell, accounted for a significant percentage of Mellanox's 2011 and 2012 annual revenues.[1]  According to Mellanox's 2011 Form 10–K, an annual report required by the SEC that provides a comprehensive summary of the company's financial performance from the past year, sales to HP accounted for 19% of the company's total annual revenue.  Id. ¶ 29.  Similarly, sales to IBM accounted for 17% of Mellanox's 2011 yearly revenue.  Id.

**B.     Intel Announces Romley CPU Platform**

Mellanox sells a variety of interconnect products to its customers.  However, the company's rapid increase in value during the Class Period was mainly attributable to sales of its flagship "InfiniBand" 56 gigabit per second (Gb/sec) computer chips.  Id. ¶ 2.  The InfiniBand chips facilitate interconnection between databases, servers, and computers within a large network.  Id.  During this period, most commercial-grade servers did not require high-performance interconnect technology and were equipped with either 1 Gb/sec or 10 Gb/sec hardware.

---

[1] Defendants request the Court to take judicial notice of seventeen documents Plaintiffs incorporate by reference in their Amended Complaint.  See ECF No. 82.  A court adjudicating a motion to dismiss may consider "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).  "The incorporation by reference doctrine permits a court to consider documents alleged in a complaint and whose authenticity no party questions, but that are not physically attached to the complaint."  In re Taleo Corp. Sec. Litig., No. c:09-001510-JSW, 2013 WL 597987, at *7 (N.D. Cal. Feb. 17, 2010) (citing Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994).  Plaintiffs have not opposed Defendants' request for judicial notice.  Because each of the seventeen documents relate to or provide context for a specific allegation in Plaintiffs' Amended Complaint, Defendants' requests for judicial notice are GRANTED.

However, a select class of "specialized" networks benefitted from the increased processing speed of the InfiniBand products, and certain OEMs were willing to pay a premium for the technology. Id.

Plaintiffs allege that throughout the Class Period, Mellanox relied heavily on an informal partnership with Intel Corporation ("Intel"), one in which Intel served as a development partner and major customer of Mellanox. Id. ¶ 3. In an attempt to demonstrate the validity and strength of Mellanox's relationship to Intel, Plaintiffs highlight that Defendant Waldman had previously worked at Intel and, together with three additional ex-Intel employees, formed Mellanox. Id. Moreover, due in part to this partnership, Mellanox won a contract to supply Intel with its 56Gb/sec InfiniBand chips to be incorporated in Intel's new high performance computing ("HPC") processing platform, known as Romley. Id. Intel's Romley platform required a faster connection speed to accommodate its rapid communication between servers. Intel's launch of the Romley platform in 1Q12 greatly increased demand for Mellanox's InfiniBand interconnect products, which in turn, caused Mellanox's stock price to increase. Id.

C.      **First Quarter 2012 ("1Q12")**

In Mellanox's first quarter earnings call, held on April 18, 2012, the company reported that it had generated $88.7 million in revenue during 1Q12. Declaration of Adam M. Regoli ("Regoli Decl."), ECF No. 83, Ex. 2 at 2. Waldman noted that sales of the 56Gb/sec InfiniBand products represented 31% of the total revenue from the quarter, sharply increasing from the 14% and 4% of total revenue InfiniBand sales generated from the previous two fiscal quarters, respectively. Id. Referencing the increased growth of the InfiniBand line of products, Defendant Waldman noted that "they continue to gain traction in the marketplace, specifically, in the high-performance computing, Web 2.0, cloud, storage and data center markets." Id.

During the call, Mellanox also issued its 2Q12 projections, estimating that the company would earn between $125 and $130 million in revenue. Id. at 4. The company attributed approximately $30 million of the quarterly revenue projection to a "one-time opportunity" driven by increased demand for Mellanox's InfiniBand chips stemming from Intel's Romley platform rollout. Id. When asked whether the company expected to see "future sequential growth" in its

1  InfiniBand product, Mellanox responded that it did not "have visibility into Q3" and that because

2  of the deployment of the Romley platforms specifically during 2Q12, the company warned of

3  "$30 million of growth in Q2 that [it] [doesn't] yet see coming back in Q3."  Id. at 6.

4        Beyond questions relating to the company's future product growth, analysts raised

5  questions regarding Intel's February 2012 acquisition of QLogic Corporation ("QLogic"),

6  previously a competitor of Mellanox which also manufactured and sold InfiniBand products.  Id.;

7  AC ¶ 5.  In response, Waldman noted that he believed Mellanox's InfiniBand products were "a

8  generation ahead of Intel or previously QLogic" because Mellanox had a "56 [Gb/sec] solution . . .

9  [w]hereas the QLogic solutions were 40[Gb/sec]."  Id.  Moreover, because of the improvements

10  Intel needed to make in the microarchitecture of its InfiniBand products, Mellanox believed that

11  "it[] [was] going to take several years for Intel . . . [to] come up with something that's

12  competitive."  Ex. 2 at 6.  However, with regard to Mellanox's Ethernet products, Waldman stated

13  that the company "obviously see[s] Broadcom and Intel with their Ethernet solutions as

14  competitors."  Id.

15        **C.    Second Quarter 2012 ("2Q12")**

16        Mellanox hosted its 2Q12 earnings call on July 18, 2012, during which the company

17  announced that it had generated a record $133.5 million of quarterly revenue, surpassing its 2Q12

18  projections.  Regoli Decl., Ex. 5 at 2.  Sales of the company's InfiniBand products represented

19  54% of the quarterly revenue, compared to 31% in 1Q12.  Id.  Waldman announced that the

20  company was "seeing continued adoption of InfiniBand as a leading interconnect in Web 2.0 and

21  cloud data centers" and that he expected to see "growth of InfiniBand utilization in [the] market in

22  the second half of 2012 and into 2013."  Id. at 5.  Gray projected that the company would earn

23  "between $150 million and $155 million" in 3Q12 revenue.  Id. at 4.

24        Similar to the questions posed to it during the 1Q12 revenue call, Mellanox was again

25  asked to provide earnings guidance beyond the upcoming fiscal quarter.  Again, Mellanox

26  repeatedly declined to provide further guidance beyond 3Q12.  Id. at 6 ("We can't give you any

27  guidance for the December quarter"); see also id. at 7 ("in terms of visibility we still don't see

28  more than 1 -- half a quarter to a quarter [into the future]"); id. ("in terms of beyond 90 days, our

visibility is still fairly limited."); id. at 8 ("we don't have visibility beyond September. And thus, we only guide for one quarter."); id. ("we have very soft visibility in terms of large programs and large deployment . . . ."); id. at 10 ("we don't have visibility beyond one quarter. So we haven't given guidance for Q4 or anything.").  However, even though the company declined to provide any official guidance, it reiterated that it continued to see growth and "deployment of InfiniBand into more markets, more applications and larger customers."  Id.

At the end of the call, the company was again asked to comment on Intel's acquisition of QLogic and the competitive landscape of the next-generation interconnects.  Id. at 14.  Defendant Waldman responded that, in order to compete in the market for next-generation InfiniBand products, Intel would likely need to develop technology beyond that which it had acquired from QLogic.  Id.  Specifically, he believed that Intel was "trying to catch up and intercept . . . over the 100 [Gb/sec] platforms."  Id.

### D.      Third Quarter 2012 ("3Q12")

On September 10, 2012, nearly a month before its 3Q12 earnings call was scheduled to take place, Mellanox hosted a special conference call to announce the retirement of CFO Michael Gray, which would take effect November 5, 2012.  Regoli Decl., Ex. 10 at 2.  During the call, Gray called his tenure with Mellanox the "highlight of [his] career" and said that he had been "contemplating" his decision to retire "for some time."  Id. at 3.  After introducing Gray's successor as then-Vice President of Finance Jacob Schulman, Waldman reiterated that Mellanox still expected its 3Q12 revenue to be "in the range of $150 million to $155 million."  Id.

On October 17, 2012, Mellanox announced during its 3Q12 earnings call that it had exceeded its revenue guidance and earned $156.5 million during 3Q12.  Regoli Decl., Ex. 12 at 2. During the call, Waldman described the proportion of revenue attributable to Intel's Romley platform: "In Q1, we had approximately $10 million in large Romley opportunities.  In Q2, we had approximately $30 million in pent-up demand and in Q3, we had approximately $25 million from 3 large deals, with the largest coming from Polywell, out large Chinese system integrator." Id.  Even without any Romley "pent-up demand" or individual large deals, Waldman expected to see a "revenue baseline of $150 million" in Q4.  Id.  He based this estimate on the fact that

InfiniBand products "continue[d] to take market share in various markets as a leading interconnect" and were "becoming more dominant as a storage interconnect across various markets and applications such as Web 2.0, HPC, cloud, and database." Id. at 5.

Looking to the fourth quarter, Waldman reiterated that the company did not "see significant large deals that [the company had previously] seen due to the Romley pent-up demand." Id. at 6.  However, he still expected Mellanox to hit the $150 million "baseline" revenue projection because the company was "able to fill the gap with other opportunities from other segments of the market." Id.  However, like before, Waldman refused to provide guidance beyond the current fiscal quarter. Id. at 5 ("We don't have visibility into Q1."); id. at 11 ("we don't give guidance or visibility more than 1 quarter.").

Beyond its revenue projections, Mellanox was once again asked about its competition from Intel.  Waldman indicated that "Intel will try to come out [with] something in the 2015, '16 time frame with their 100[Gb/sec] solution. It's yet to be seen how we will work together if we work together at that time. And obviously, Mellanox [will] continue to develop [its] own solutions for the 100 [Gb/sec], which we think will come out in [the] 2014 time frame, so we still hope to continue leading this market and keep taking market share away from our competitors." Id. at 9. When asked how Mellanox would respond if Intel offered an integrated product, which would eliminate the need to purchase InfiniBand products from Mellanox, Waldman responded, "we'll find the right way to work with them or to compete with them." Id.

Finally, Waldman emphasized that "every time you see an instruction for a larger CPU . . . you'll see higher demand for better interconnect and you'll see a significant higher attach rate for our connectivity like you've seen from Q1 of this year to Q3 and also into Q4 of this year. So we believe every time you see a new CPU with more performance, more capabilities . . . you'll see higher attach rate of Mellanox interconnect, both InfiniBand and Ethernet, into the market." Id. at 11.

### E.     Fourth Quarter 2012 ("4Q12")

In its January 3, 2013 4Q earnings call, Mellanox announced that it had failed to meet its 4Q projected revenue, marking its "first revenue miss since [the company] went public over 5

years [prior]." Regoli Decl., Ex 16 at 3.  Specifically, the company reported that the fourth quarter revenue was in the "range of $119 million to $121 million," which was below its "previous guidance of $145 million to $150 million."  Regoli Decl., Ex. 15 at 1.  The company cited several reasons for the lower than expected revenues, namely "a weaker demand environment, challenging macroeconomic conditions, and a technical issue associated with FDR 56[Gb/sec] InfiniBand cabling which caused approximately $20 million of FDR deployments to be delayed."  Id.  During the earnings call, Waldman elaborated on the reasons behind the miss.  Regarding the technical issue, Waldman explained that the company "encountered a component problem with [the] FDR fiber optic cable solution . . . which resulted in lower performance."  Regoli Decl., Ex. 16 at 2. Mellanox estimated that the technical issue accounted for nearly $20 million of the missing revenue.  Id.  Regarding the weaker demand, Waldman revealed that the company discovered that "one of [the] large OEM customers had overbought products from [Mellanox] in anticipation of higher demand, which did not materialize.  Correspondingly, this customer experienced higher-than-expected inventory levels due to the weakening demand in the quarter."  Id.  Usually Mellanox has "pretty good visibility into [its] OEMs," but in this case, Waldman explained, there was a personnel change within the particular OEM that decreased Mellanox's visibility into the needs of the particular OEM.  Id. at 5–6.

### F.    Alleged Securities Fraud

Plaintiffs allege that Mellanox and individual Defendants Waldman, Gray, and Shulman issued numerous materially false or misleading statements during the Class Period regarding the company's prominence in the interconnect market and its prospects for future growth and revenue generation.  AC ¶ 4–7.  Plaintiffs maintain that many of the revenue and growth projections were false when made or that the speaker had no reasonable basis to believe that the statements were true.  Plaintiffs also contend that Defendants omitted material information that rendered other statements false or misleading.

Plaintiffs provide five reasons why Defendants' statements were false or misleading:

1.    Defendants knew that the Company's 1Q, 2Q and 3Q growth was not sustainable, but was instead due to short-term sales boosts attributable to Intel's rollout of the Romley CPU

1   upgrade (AC ¶ 67(a), 74(a), 80(a), 82(a), 90(a));

2      2.      Despite Defendants' representations of strong and sustainable growth, the

3   Company was experiencing tepid demand for its InfiniBand 56/Gb, rendering its growth

4   projections unachievable (AC ¶ 67(b), 74(b), 80(b), 82(b), 90(b));

5      3.      Defendants knew that Intel was poised to develop its own InfiniBand product,

6   which would leapfrog Mellanox's, detrimentally increasing competition in the InfiniBand market

7   where Mellanox had enjoyed a near monopoly (AC ¶ 67(c), 74(c), 80(c), 82(c), 90(c));

8      4.      Defendants knew that Mellanox was experiencing chronic delays in shipping cable

9   orders to its largest customers (due to product defects, upon information and belief), totaling

10  hundreds of thousands of dollars, causing the Company to fall short of forecasted revenue because

11  the Company does not recognize revenue until product ships (AC ¶ 80(d), 82(d), 90(d)); and

12     5.      Defendants knew that inventory at HP of products containing Mellanox

13  components was increasing, which would lead to a decrease in sales and profit margins going

14  forward (AC ¶ 90(e)).

15     Defendants argue that Plaintiffs' allegations fail to satisfy the heightened pleading

16  standards required in a securities fraud action, based on five alleged defects: (1) Plaintiffs have

17  failed to plead any false or misleading statement with particularity; (2) Plaintiffs fail to plead facts

18  giving rise to a strong inference of scienter as to any allegedly false statement; (3) Plaintiffs fail to

19  adequately allege loss causation with regard to four of Plaintiffs' five offered corrective

20  disclosures; (4) many of the allegedly false or misleading statements at issue were forward-

21  looking projections and were accompanied by sufficient cautionary language to bring them within

22  the PSLRA's safe harbor; and (5) many of the allegedly false or misleading statements at issue on

23  which Plaintiffs premise liability are vague and indefinite opinions that constitute non-actionable

24  corporate "puffery."

25  **II.    GOVERNING STANDARDS**

26     **A.    Motion to Dismiss**

27     On a motion to dismiss, courts accept the material facts alleged in the complaint, together

28  with reasonable inferences to be drawn from those facts, as true.  Navarro v. Block, 250 F.3d 729,

United States District Court
Northern District of California

8

732 (9th Cir. 2001).  However, "the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  To be entitled to the presumption of truth, a complaint's allegations "must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011), cert. den'd, 132 S. Ct. 2101 (2012).

In addition, to survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Plausibility does not mean probability, but it requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

**B.      Securities Fraud**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b).  Pursuant to this section, the Securities and Exchange Commission promulgated Rule 10b-5, which makes it unlawful, among other things, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10(b)–5(b).

To state a securities fraud claim, a plaintiff must plead: "(1) a material representation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Thompson v. Paul, 547 F.3d 1055, 1061 (9th Cir. 2008) (quoting Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008)).

Securities fraud plaintiffs must satisfy both Rule 9(b) and the requirements of the PSLRA.

United States District Court
Northern District of California

United States District Court
Northern District of California

In re VeriFone Holdings, Inc. Sec. Litig., 704 F.3d 694, 701 (9th Cir. 2012).  Under Rule 9(b), claims alleging fraud are held to a heightened pleading requirement, which demands that a party "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  In addition, claims alleging securities fraud are subject to the "more exacting pleading requirements" of the PSLRA, which require the plaintiff to plead both falsity and scienter with particularity. Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 990 (9th Cir. 2009).  The PSLRA establishes uniform and stringent pleading requirements for securities fraud actions, and was designed to end the practice of pleading "fraud by hindsight."  See In re Silicon Graphics, Inc. Sec. Litig., 183 F.3d 970, 958 (9th Cir. 1999).

### 1.     Pleading Materiality and Falsity

For statements or omissions to be actionable under the PSLRA, they must be both misleading and material.  A statement or omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  Basic Inc. v. Levinson, 485 U.S. 224, 231–32 (1976) (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)).  A statement or omission is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'"  Berson v. Applied Signal Tech., Inc., 527 F.3d 982, 985 (9th Cir. 2008) (citation omitted).  To adequately plead that a statement or omission is misleading, often referred to as falsity, a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading."  15 U.S.C. § 78u–4(b)(1)(B).  If an allegation regarding a statement or omission is made on information and belief, the complaint must "state with particularity all facts on which that belief is formed."  Id.

### 2.     Pleading Scienter

The PSLRA's heightened scienter pleading standard requires that a plaintiff "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2).  The required state of mind is a "mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194–94 n.12

1   (1976).  Deliberate or conscious recklessness constitutes intentional conduct sufficient to satisfy

2   the scienter requirement.  "Reckless conduct may be defined as a highly reasonable omission,

3   involving not merely simple, or even inexcusable negligence, but an extreme departure from the

4   standards of ordinary care, and which presents a danger of misleading buyers or sellers that is

5   either known to the defendant or is so obvious that the actor must have been aware of it."  In re

6   Silicon Graphics, 183 F.3d at 974 (quoting Sunstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033,

7   1045 (7th Cir. 1977)).  "The ultimate question is whether the defendant knew his or her statements

8   were false, or was consciously reckless as to their truth or falsity."  Gebhart v. SEC, 595 F.3d

9   1034, 1042 (9th Cir. 2010).

10          The "strong inference" of a culpable state of mind required by the PSLRA "must be more

11   than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light

12   of other explanations."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 324 (2007).

13   "A court must compare the malicious and innocent inferences cognizable from the facts pled in the

14   complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference

15   is at least as compelling as any opposing innocent inference."  Zucco Partners, 552 F.3d at 991.  In

16   determining whether a complaint meets the "strong inference" requirement, a court must consider

17   the allegations and other relevant facts holistically, not "scrutinized in isolation."  In re VeriFone

18   Holdings, 704 F.3d at 701.

19          In reviewing a complaint under this standard when faced with a motion to dismiss, "the

20   court must consider *all* reasonable inferences to be drawn from the allegations, including

21   inferences unfavorable to the plaintiffs."  Gompper v. VISX, Inc., 298 F.3d 893, 897 (9th Cir.

22   2002); accord Tellabs, 551 U.S. at 310 ("[I]n determining whether the pleaded facts give rise to a

23   'strong' inference of scienter, the court must take into account plausible opposing inferences.")

24   **III.    DISCUSSION**

25          **A.    Materiality and Falsity**

26                  **1.    Non-Actionable Statements of Corporate Puffery**

27          Defendants argue that many, if not all of the statements or representations challenged by

28   Plaintiffs' Amended Complaint are non-actionable statements of corporate puffery.

1    Numerous courts, including the Ninth Circuit, have held that general assertions of

2    corporate optimism or statements of "mere puffing" are not actionable as material

3    misrepresentations under the PSLRA.  See In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir.

4    2010); Glen Holly Entm't, Inc. v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir. 2003); In re Impac

5    Mortg. Holdings, Inc. Sec. Litig., 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008); In re Copper

6    Mountain Sec. Litig., 311 F. Supp. 2d 857, 868–69 (N.D. Cal. 2004).  "Statements of 'mere

7    puffing' are forward-looking statements of optimism that are 'not capable of objective

8    verification' and 'lack a standard against which a reasonable investor could expect them to be

9    pegged.'"  In re Impac, 554 F. Supp. 2d at 1096 (citing Grossman, 120 F.3d at 1119).  Such

10   statements employ terms that are "not measurable" and not "tethered to facts 'that a reasonable

11   person would deem important to a securities investment decision.'"  In re Cornerstone Propane

12   Partners, L.P., 355 F. Supp. 2d 1069, 1087 (N.D. Cal. 2005).

13   The "mere puffery" rule has differentiated statements containing "definitive positive

14   projections" from assertions claiming "excellent results," "a blowout winner" product, "significant

15   sales gains," and "10% to 30% growth rate over the next several years."  Id. (citing Grossman, 120

16   F.3d at 1119).  Beyond these, the Ninth Circuit has found similar statements to be non-actionable

17   puffing.  See In re Syntex Corp. Litig., 855 F. Supp. 1086, 1095 (N.D. Cal. 1994), aff'd, 95 F.3d

18   922 (9th Cir. 1996) (finding the following statements non-actionable: "'we're doing well and I

19   think we have a great future,' 'business will be good this year . . . [and] we expect the second half

20   of fiscal 1992 to be stronger than the first half, and the latter part of the second half to be stronger

21   than the first . . . ,' 'everything is clicking [for the 1990s] . . . new products are coming in a wave,

22   not a trickle . . . old products are doing very well,' and 'I am optimistic about Syntex's

23   performance during this decade'").  Such statements are not "material" because they are statements

24   upon which no reasonable investor would rely, and thus they fail to satisfy the falsity and

25   materiality requirement under the PSLRA.

26   The Ninth Circuit has, however, limited the "mere puffery" doctrine by defining the point

27   at which a "projection or statement of belief" becomes an actionable, material misrepresentation

28   under federal securities laws.  Projections or statements of belief are actionable under section

United States District Court
Northern District of California

12

1    10(b) when "(1) the statement is not actually believed, (2) there is no reasonable basis for belief,

2    or (3) the speaker is aware of undisclosed facts tending to seriously undermine the statement's

3    accuracy."  See Kaplan v. Rose, 49 F.3d 1363, 1375 (9th Cir. 1994).

4         The pertinent question for the Court, then, is whether each assertion challenged in this suit

5    contained a "projection or statement of belief" or merely a "vague, generalized assertion of

6    corporate optimism."  If the statement was one of projection or belief, it is nonetheless non-

7    actionable if Plaintiffs have failed to plead with particularity that (1) the speaker did not actually

8    believe the statement, (2) there was no reasonable basis for the speaker's belief, or (3) the speaker

9    was unaware of undisclosed facts tending to seriously undermine the statement's accuracy.  See

10   Kaplan, 49 F.3d at 1375.  A statement of "mere puffery" cannot serve as the basis of a securities

11   claim.  See Gammel v. Hewlett-Packard Co., 905 F. Supp. 2d 1052, 1071 (C.D. Cal. 2012)

12   ("Whether a statement constitutes 'mere puffing' has nothing to do with the maker's state of mind.

13   Rather, a statement constitutes inactionable puffery—even if the maker was aware if its falsity—if

14   the statement is 'so generalized, vague and unspecific' that no reasonable consumer could rely on

15   it.") (quoting Glen Holly Entertainment, Inc. v. Tektronix, Inc., 352 F.3d 367, 379 (9th Cir.

16   2003)).

17        In response to Defendants' argument that the challenged statements are mere puffery,

18   Plaintiffs, in a single footnote, contend that statements similar to the ones at issue in this action

19   have been held "actionable" by the Ninth Circuit.  Opp., ECF No. 87 at 14 n.10.  Plaintiffs cite

20   only to Kaplan v. Rose, 49 F.3d 1363, 1375–76 (9th Cir. 1994), a pre-PSLRA case in which the

21   Ninth Circuit reversed the district court's grant of summary judgment because material issues of

22   fact existed as to whether the plaintiff had shown reliance on any of the alleged misstatements.

23   The Ninth Circuit in Kaplan did not comment on whether the optimistic statements in question

24   were "mere puffery," and it emphasized it "did not hold that [the Plaintiff] has established his

25   theory[,] [but] only that [the Defendant] has not eliminated the possibility that a rational jury could

26   find that the alleged misrepresentations and omissions mislead the market."  Id. at 1378.

27   Plaintiffs' citation to Kaplan is unpersuasive.

28        It is clear from the complaint that most of the challenged statements were opinions of

United States District Court
Northern District of California

13

United States District Court
Northern District of California

general optimism that are precluded by the "mere puffery" doctrine.  Waldman and Gray's assertions that Mellanox's products have "continue[d] to gain traction in the marketplace," have experienced "increased penetration . . . in new markets," resulting in "significant . . . end-user demand" and "healthy growth in . . . revenue," positioning Mellanox to "continue growing in the coming years at a pretty fast pace" all constitute non-actionable, vague, unspecific assertions of corporate optimism.  See AC ¶¶ 65, 67, 74; McDonald v. Compellent Tech., Inc., 805 F. Supp. 2d 725, 735 (D. Minn. 2011) (finding statements that company "continue[s] to gain traction in the marketplace" amounted to non-actionable puffery); In re Peritus Software Services, Inc. Sec. Litig., 52 F. Supp. 2d 211, 220 (D. Mass. 1999) (categorizing statements that a company's products experienced "unprecedented market demand" as corporate puffery).  Accordingly, the Court finds that the following statements amount to non-actionable puffery that cannot serve as bases for Plaintiffs' securities claims:

- In the April 18, 2012 press release reporting Mellanox's 1Q12 earnings, Mr. Waldman stated that Mellanox's "strong quarterly revenue growth reflects the increased penetration of our high-performance InfiniBand and Ethernet interconnect solutions in new markets."  AC ¶ 67.

- In the same press release, Mr. Waldman indicated that the recent launch of Intel Romley and Sandy Bridge server and platforms had "created significant industry-upgrade and end-user demand for high-performance interconnects."  AC ¶ 67.

- During Mellanox's April 18, 2012 1Q12 earnings call, Mr. Waldman stated that "[e]ven without those kind of one-time lump opportunities, [Mellanox was] experiencing very healthy growth in [its] revenues."[2]  AC ¶ 67.  AC ¶ 80.

- During the 1Q12 earnings call, Mr. Waldman also noted that Mellanox's InfiniBand products "continue to gain traction in the marketplace."  AC ¶ 67.

- On May 7, 2012, Mr. Waldman presented at the Jefferies Global Technology, Internet, Media & Telecom Conference, where he declared that "we think we can continue growing in the coming years in a pretty fast pace."  AC ¶ 74.

---

[2] See In re Cable & Wireless, PLC, 332 F. Supp. 2d 896, 902 n.6 (E.D. Va. 2004) (holding as inactionable puffery a company's statement that "[its] results demonstrate healthy growth and exceptionally strong finances").

14

- At the same conference, Mr. Waldman noted that "[i]n terms of annual revenues, we're growing very fast." AC ¶ 74.

- Also at the conference, Mr. Waldman expressed that the company believes that it "[can] continue growing pretty fast into 2013." AC ¶ 74

- In a July 18, 2012 press release, in which Mellanox released its 2Q12 financial results, Mr. Waldman is quoted as saying that the company believes that its quarterly revenue growth "demonstrates the broader market acceptance of both our FDR 56 GB/sec InfiniBand and 10 and 80 Gigabit Ethernet Solutions." AC ¶ 80.

- That same day, during the company' 2Q12 earnings call, Mr. Waldman emphasized that "[w]e continue to see InfiniBand take market share in various markets as the leading interconnect for server and storage platforms."[3] AC ¶ 80.

- During the 2Q12 earnings call, Mr. Waldman also noted that "[w]e are seeing InfiniBand become more dominant as a storage interconnect across various markets and applications."[4] AC ¶ 80.

- Moreover, during the call, Mr. Waldman added that the company was "seeing continued adoption of InfiniBand as the leading interconnect in Web 2.0 and cloud datacenters and [it] expect[ed] to experience growth of InfiniBand utilization in this market in the second half of 2012 and into 2013."[5] AC ¶ 80.

- During the same call, Mr. Waldman noted that "we continue to see our growth. We continue to see penetration into the markets we've been talking about and we are enjoying the deployments of InfiniBand into more markets, more applications and larger customers." AC ¶ 80.

- Finally, near the end of the 2Q12 earnings call, Mr. Waldman noted that there was "an appetite for higher bandwidth solutions and in the HPC market." AC ¶ 80.

---

[3] See Fitzer v. Security Dynamics Technologies, Inc., 119 F. Supp. 2d 12, 24 (D. Mass. 2000) (finding the phrase "continued market demand" vague and inactionable inasmuch as it failed to "specify a particular market demand [or] a market share figure").

[4] See In re Harman International Industries, Inc. Sec. Litig., No. 07-1757(RC), 2014 WL 197919 (D.D.C. Jan. 17, 2014) (finding a company's statements regarding its "dominance" in the marketplace non-actionable because the use of the word "dominance" merely put a vague positive spin on the company's expansion into a new market and made no comparisons to any competitor in terms of sales, revenue, or profitability).

[5] See In re Cornerstone Propane Partners, L.P., 355 F. Supp. 1069, 1087 (N.D. Cal. 2005) (finding a corporate executive's claims of "industry leading growth" and "continuing improvements" non-actionable assertions of corporate optimism).

- Also, at that same forum, Mr. Gray said "I think there's [*sic*] numerous opportunities for Romley-based FDR applications for us to continue to grow.  Because generally when we introduce a higher-bandwidth solution, it's going to grow and it steadily grows."  AC ¶ 82.

- On September 10, 2012, Mellanox hosted an Executive Update call wherein Mr. Gray expressed his belief that the company had not experienced a "one-quarter wonder" and that he was "comfortable with [the company's] long-term model."  AC ¶ 90.

- On October 18, 2012, Mr. Waldman allegedly told *Globes* magazine that the company's 3Q12 results "demonstrate[d] the company's continued ability to increase its penetration into existing markets, as well as to expand into markets for our InfiniBand solutions."  AC ¶ 91, 102.

- Similarly, during Mellanox's October 17, 2012 guidance call, Mr. Waldman expressed that "we still hope to continue leading this market and keep taking market share away from our competitors."  AC ¶ 94, 102.

- During the same conference, Mr. Shulman indicated that "[w]e believe FDR products could grow higher from current levels" and that "[w]e expect our HPC revenues to grow. . . . [W]e have much bigger base in the HPC that's also the—we will see growth in that market as well."  AC ¶ 104, 113.

It is clear that the various Mellanox executives expressed optimism for the company's continued success.  But such statements constitute vague, unspecific assertions of corporate optimism and may not serve as the basis for a misrepresentation claim under federal securities laws, because the statements are incapable of objective measurement and are the type of hopeful, nebulous statements that reasonable investors have come to expect from high-ranking company executives.  See Bridgestone, 387 F.2d at 488 (noting that "reasonable investors expect corporate managers to be confident about their stewardship").

Furthermore, with regard to various allegedly false or misleading "projections or statements of belief," Plaintiffs have not pled with particularity facts to suggest that "(1) the statement[s] were not actually believed, (2) there [was] no reasonable basis for belief, or (3) the speaker[s] [were] aware of undisclosed facts tending to seriously undermine the statements' accuracy."  See Kaplan, 49 F.3d at 1375.  Defendants made clear that revenue associated with the Romley rollout was a "one-time opportunity," and they continually stressed that other non-Romley opportunities positioned Mellanox to experience continued growth into the future.  See Regoli

16

1    Decl., Ex. 2 at 5 ("The introduction of Intel's new Romley and Sandy Bridge platforms will

2    increase the attach rate of our products to the compute and storage platforms as they demand high-

3    performance interconnect technology. We are working with multiple partners to provide better

4    solutions in various markets . . . [s]uch [as] Microsoft with the support for Windows Server 8 and

5    EMC and VMware and others to provide multiple big data appliances."); Ex. 12 at 6 ("And [in]

6    Q4, we don't see significant large deals that we've seen due to the Romley pent-up demand and

7    we're actually pretty happy to see that we are still staying with the baseline of $150 million. And

8    the one that sealed our deals then was the Polywell during the quarter, which we noted was about

9    11% of our Q3 revenues.").

10         Given the availability of non-Romley business opportunities and the applicability of

11   InfiniBand chips in non-Romley OEM products, Plaintiffs have not adequately alleged that

12   Mellanox's executives had no reasonable basis to believe that the impressive revenue earnings

13   would continue. Accordingly, Plaintiffs' allegations of false or misleading projections or

14   statements of belief cannot support their securities claims.

15              **2.       The PSLRA's Safe Harbor and the "Bespeaks Caution" doctrine.**

16         Beyond the statements containing non-actionable puffery, the AC alleges that various other

17   statements were materially false or misleading. However, many of the remaining statements fall

18   within PSLRA's "safe harbor" and are not actionable under the PSLRA and the "bespeaks

19   caution" doctrine.

20         "The bespeaks caution doctrine provides a mechanism by which a court can rule as a

21   matter of law (typically in a motion to dismiss for failure to state a cause of action or a motion for

22   summary judgment) that defendants' forward-looking representations contained enough

23   cautionary language or risk disclosure to protect the defendant against claims of securities fraud."

24   In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1413 (9th Cir. 2004) (internal quotation and

25   citation omitted). The PSLRA created a statutory version of the bespeaks doctrine by providing a

26   safe harbor for forward-looking statements, identified as such, which are accompanied by

27   meaningful cautionary language. See 15 U.S.C. § 78u–5(c); Grossman, 120 F.3d at 1121

28   (identifying PSLRA's safe harbor as a statutory form of the bespeaks caution doctrine) (citing

United States District Court
Northern District of California

17

1  Shaw v. Digital Equip. Corp., 82 F.2d 1194, 1213 & n.23 (1st Cir. 1996)).  For the doctrine to

2  properly apply, there must be sufficient "cautionary language or risk disclosure that reasonable

3  minds could not disagree that the challenged statements were not misleading."  Fecht v. Price Co.,

4  70 F.3d 1078, 1082 (9th Cir. 1995).

5       The statutory definition of a forward-looking statement includes statements containing

6  projections of revenues, income, earnings per share, management's plans or objectives for future

7  operations and predictions of future economic performance.  See In re Splash Technology

8  Holdings, Inc. Sec. Litig., No. 99-cv-00109-SBA, 2000 WL 1727377 at *6 (N.D. Cal. Sept. 29,

9  2000) (citing 15 USC § 78u–5(i)(1)(A)–(C)).  Any statement of the assumptions underlying or

10  relating to these types of statements falls within the meaning of a forward-looking statement.  Id.

11  (citing 15 USC § 17u–5(i)(1)(D)).  Additionally, a present-tense statement may qualify as

12  forward-looking "if the truth or falsity of the statement cannot be discerned until some point in

13  time after the statement is made."  Id. (citing Harris v. Ivax Corp., 182 F.3d 799, 805 (11th Cir.

14  1999)).

15       The Court concludes that many of the challenged statements fall within the PSLRA's safe

16  harbor because they were forward-looking, and because Mellanox either directly included

17  sufficient cautionary language, or directed listeners to review the risks discussed in greater detail

18  in other documents.  Such cautionary language, coupled with language identifying statements as

19  forward-looking, immunizes the company's forward-looking statements from securities liability.

20       First, the company prefaced its 2012 annual 10-K filing with a "special note" regarding

21  forward-looking statements, which included both general cautionary language about the nature of

22  such statements, as well as ten specific factors that might cause the company's performance to

23  differ from its forward-looking statements.  Regoli Decl., Ex 1. at 3.  Mellanox's 10-K also

24  contained a section called "Risk Factors," which spanned eighteen pages and explained in great

25  detail the specific risks Mellanox faced.  Id. at 19–37.  In it, Mellanox thoroughly explained that

26  "InfiniBand may not be adopted at the rate or extent that [the company] anticipate[s], and adoption

27  of InfiniBand is largely dependent on third-party vendors and end users."  Id. at 20.  The company

28  warned that success of the InfiniBand technology is "dependent on continued collaboration and

18

cooperation among information technology, or IT, vendors." Id.  Mellanox also revealed that it

relies on "embedded systems vendors to incorporate and deploy InfiniBand integrated circuits, or

ICs, in their systems." Id.  Moreover, Mellanox revealed that the company "has limited visibility

into end-user demand for [its] products and generally have short inventory cycles, which introduce

uncertainty into [the company's] revenue and production forecasts and business planning and

could negatively impact [the company's] financial results. Id.  Beyond this, the company warned

that it "depend[s] on a small number of customers for a significant portion of [its] sales and the

loss of any one of these customers will adversely affect [the company's] revenues." Id. at 21.

   In addition to Mellanox's Form 10–K, the company included within each of its quarterly

10–Q or 8–K reports language similarly alerting readers to the presence of forward-looking

statements. See Regoli Decl., Ex. 3 at 16–17, 26–29 (Mellanox's 1Q12 Form 10–Q identifying

forward-looking statements and detailed risks facing the company); Ex. 4 at 5 (Mellanox's 2Q12

Form 8–K identifying forward-looking statements); Ex. 6 at 7, 18, 30–32 (Mellanox's 2Q12 Form

10–Q identifying forward-looking statements and detailed risks facing the company); Ex. 8 at 3;

(Mellanox's Press Release identifying forward-looking statements); Ex. 11 at 5 (Mellanox's 3Q12

Form 8–K identifying forward-looking statements); Ex. 13 at 7, 11, 30–33 (Mellanox's 3Q12

Form 10–K identifying forward-looking statements and detailed risks facing the company); Ex. 15

at 1–2 (Mellanox's 4Q12 updated financial outlook identifying forward-looking statements).

   Apart from its financial documents, Mellanox prefaced each earnings call with a forward-

looking statement warning, and directed listeners to review its 10–K, its 10–Qs, 8–Ks, and its

press releases for a discussion of risks facing the company. See, e.g., Regoli Decl., Ex. 2 at 2; see

also Regoli Decl., Ex. 5 at 2 (warning of forward-looking statements in Mellanox's 2Q12 earnings

call); Ex. 10 at 2 (warning of forward-looking statements in Mellanox's Executive Call

announcing Gray's retirement); Ex. 12 at 2 (Mellanox's 3Q12 earnings call); Ex. 16 at 2 (warning

of forward-looking statements in Mellanox's 4Q12 earnings call).

   The PSLRA's safe harbor requires that the cautionary language mention "important factors

that could cause actual results to differ materially from those in the forward-looking statement."

15 U.S.C. § 77z–2(c)(1)(A)(i).  Mellanox clearly, repeatedly, and explicitly identified specific risk

factors that Mellanox faced with regard to the company's future success and the market's adoption of the InfiniBand interconnect products. In addition, the company repeatedly warned of the presence of forward-looking statements and pointed to the specific "risk factors that could cause [the] actual results to differ materially from those in the forward-looking statements." Regoli Decl., Ex. 2 at 2.

Plaintiffs refer to Mellanox's cautionary statements as "hollow" "boilerplate statements" that are "plainly . . . inadequate." Opp. at 15–16. Relying on the decision in Provenz v. Miller, 102 F.3d 1478, 1493–94 (9th Cir. 1996), Plaintiffs argue that the cautionary language was "not in any way specific to Mellanox's claimed ability to sustain its FDR-related revenues." Id. at 15. However, in Provenz, the plaintiff corporation merely identified that the company faced an "uncertain economic environment" and was approaching the next few fiscal quarters with "a very conservative outlook and conservative management posture." Provenz, 102 F.3d at 1493–94. The facts of Provenz are inapposite, and the Court has little difficulty distinguishing the inadequate cautionary language in that case from the specific cautionary language provided by Mellanox.

Plaintiffs also appear to challenge the adequacy of Mellanox's cautionary language in that each forward-looking statement was not directly accompanied with the specific risk associated with the statement. However, detailed cautionary language need not specifically accompany each alleged misrepresentation to properly fall within the PSLRA's safe harbor for forward-looking statements. See Employers Teamsters Local Nos. 175 and 505 Pension Trust Fund v. Clorox Co., 353 F.3d 1125, 1132–34 (9th Cir. 2004). In Clorox, the Ninth Circuit faced a similar question of whether a company's cautionary language was sufficient to insulate its forward-looking statements from liability under federal securities laws. Id. at 1132. There, investors sued Clorox and several of its individual officers for allegedly understating problems associated with a recent corporate acquisition. Id. at 1127. Specifically, the investors claimed that an executive's statement predicting that problems associated with the acquisition would be resolved within one year did not fall within the safe harbor because it lacked meaningful cautionary language. Id.

In analyzing the cautionary language, the Ninth Circuit first looked to an earnings call held by the corporate defendant. At the beginning of the call, a Clorox representative reminded the

listeners that "any forward-looking statements made on this call represent [the company's] best judgment" and "actual results will depend on a number of competitive and economic factors . . . which may be outside the control of the Company." Id. at 1132.  Accordingly, the representative directed the listeners to review the most important risk factors within the company's Form 10–K filing. Id. at 1132–33.  The court noted that the 10–K cautioned that "there can be no assurance that Clorox will be able to successfully integrate acquisitions." Id. at 1133.

Finding the warning that prefaced the call adequate, the court explained that "the PSLRA does not require that the cautions physically accompany oral statements." Id.  Instead, if the other statutory requirements are met, "§ 78u–5(c)(2)(B)(i) provides that for forward-looking oral statements such as [the corporate defendant's] the safe harbor extends to an oral statement that 'additional information concerning factors that could cause actual results to materially differ from those in the forward-looking statement is contained in a readily available written document.'" Id. (quoting 15 U.S.C. § 78u–5(c)(2)(B)(i)).

Here, to the extent that Plaintiffs challenge the adequacy of the cautionary language in that it did not physically accompany each forward-looking statement made by Defendants, such claims are unavailing because, at numerous points in time, through various media, Mellanox outlined in detail the specific risks the company faced.  For example, during the various earnings calls, a corporate representative directed the callers' attention to the specific risks laid out in the company's 10–K filing, 10–Q fining, and its various press releases.  See Regoli Decl., Ex. 2 at 2 ("We have provided additional information about risk factors that could cause our actual results to differ materially from those in the forward-looking statements in today's conference call in our press release, in our Form 10–Q filed with the SEC on November 4, 2011 or in our Form 10–K filed on February 28, 2012. If you do not have a copy of our 10–Q or 10–K, you can find it at ir.mellanox.com or we'll be happy to provide you with one.")

Importantly, the PSLRA's safe harbor provision provides that "if a forward-looking statement is identified as such and accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is irrelevant, and the statement is not actionable regardless of the plaintiff's showing of scienter." In re Cutera, 610 F.3d at 1112.  As

United States District Court
Northern District of California

written, the statute provides a safe harbor for:

> (A)(i)   identified   forward-looking   statements   with   sufficient cautionary language;
>
> (A)(ii) immaterial statements; and
>
> (B)(i)–(ii) unidentified forward-looking statements or forward-looking statements lacking sufficient cautionary language where the plaintiff fails to prove actual knowledge that the statement was false or misleading.

15 U.S.C. § 78u–5(c)(1).  The text of the safe harbor provision provides that a defendant's state of mind is relevant only for evaluating identified or unidentified forward-looking statements that lack sufficient cautionary language.  See In re Cutera at 1113.  Therefore, when statements are identified as forward-looking and are accompanied by meaningful cautionary language, they automatically fall within the PSLRA's safe harbor and no showing of the speaker's state of mind can revive claims based on the immunized statements.  Accordingly, each identified forward-looking statement accompanied by meaningful cautionary language requires no showing of scienter because such statements automatically fall within the PSLRA's safe harbor.

For all of these reasons, the Court concludes that the following forward-looking statements, made during earnings calls or within financial disclosures, were accompanied by sufficient, meaningful cautionary language, bringing them within the PSLRA's safe harbor:

- During Mellanox's 2Q12 earnings call, Mr. Gray expressed that "it's really healthy growth that we're expecting really not just in HPC, but also on the other target markets, specifically Web 2.0, storage and the enterprise datacenter."  AC ¶ 77, 80.

- In the same call, Mr. Waldman indicated that the company "expect[ed] InfiniBand to continue to deploy. We don't know the rate or the pace, but we see them continue to deploying [sic] in the coming quarters."  AC ¶ 77, 80.

- During Mellanox's 3Q12 earnings call, Mr. Waldman confirmed that the company viewed "$150 million [as the] baseline [for future quarterly revenue]."  AC ¶ 94, 102

- Again during the 3Q12 earnings call, Mr. Waldman noted that the company's 4Q12 guidance did not include any revenue from "pent-up demand for Romley."  However, the company was able to maintain its lofty revenue projections for 4Q12 because it was "able to fill the gap with other opportunities from other segments of the

market."[6]  AC ¶ 92, 102.

- During the same call, Mr. Waldman noted that "[w]e think [the HPC sector is] going to continue growing. We think it's going to continue growing in 2013 and people will continue to build large supercomputers based on Romley and future generations from Intel." AC ¶ 92, 102.

- Furthermore, Mr. Waldman confirmed that he expected [InfiniBand] to remain a high percentage of revenue and that he believed that revenues would not be sequentially down in both Q4 and Q1.  AC ¶ 92, 102

- When asked about his opinion regarding the company's "longer-term pipeline of large deals relative to Intel cycles" Mr. Waldman noted that the company "expect[s] to see large HPC deals in 2013 before the next Intel chipset." AC ¶ 94, 102.

- When asked about the company's projected future growth, Mr. Waldman commented that "we believe we'll be able to continue growing nicely into 2013." ¶ 94, 102.

To the extent that Plaintiffs base their claims on the forward-looking statements listed above, Mellanox and each individual Defendant are protected from liability under PSLRA's safe harbor provision.

### 3.    Other Statements

The Court has found that many of the allegedly false or misleading statements contained in financial disclosures or earnings calls were instances of non-actionable corporate puffery or forward-looking statements immunized by the PSLRA's safe harbor.  However, there remain several statements that are not puffery or that do not fall within the safe harbor.  Those statements include:

- At a June 26, 2012 NASDAQ OMX Investor Program, Mr. Waldman indicated that "we can grow [the annual revenue] and $430 million this year expectation." AC ¶ 73–74.

- During Mellanox's 2Q12 earnings call, Mr. Waldman noted that "[w]e continue to see large, high-performance computing deployments worldwide use our FDR InfiniBand interconnect solutions."    He added that "there's a continuous flow of supercomputers to be built in the next coming two or three years that

---

[6] This statement properly qualifies as forward-looking even though based in the present-tense because "the truth or falsity of the statement [could not] be discerned until some point in time after the statement was made."  See In re Splash Technology, 2000 WL 1727377 at *6 (citing Harris v. Ivax Corp., 182 F.3d 799, 805 (11th Cir. 1999)).

United States District Court
Northern District of California

we are already are aware of."  AC ¶ 76–77, 80.

- During that same call, Mr. Waldman noted that "we do see a number of large deals both in, like Mike said, HPC and cloud and Web 2.0. So we do—we can identify a number of them that are very large."  AC ¶ 77, 80.

- At an August 12, 2012 Global Technology Leadership forum, Mr. Gray explained that "we've seen . . . greater traction within storage, within not just HPC but also within the enterprise data center, within other and new Web 2.0 accounts, that are behind the guidance we gave of $150 to $155 million."  AC ¶ 82.

- During a November 29, 2012 J.P. Morgan Conference, Mr. Shulman reportedly said that "we see a nice penetration of our FDR products within th[e HPC] market.  A year ago . . . [o]nly, I think, two systems were connected with FDR.  In June, 21, and in November, 46, so it's a very, very nice growth of our FDR products within that market."  AC ¶¶ 104, 113.

- During Mellanox's 3Q12 earnings call, Mr. Waldman reminded the investors that "people continue deploying [supercomputers] regardless of the Intel new introductions."  AC ¶ 94, 102.

First, with regard to Waldman's revenue projection at the NASDAQ Investor Program, there is no evidence before the Court that suggests his statement was identified as forward-looking and accompanied by meaningful cautionary language, shielding it from liability under the PSLRA's safe harbor.  As the court noted in Copper Mountain, "[w]hile . . . it may be true that a reasonable investor would investigate information available in a public document and would attribute any warnings in such a document to other statements by the company's representatives, making such an assumption does not comport with the text of the PSLRA."  Copper Mountain, 311 F. Supp. 2d at 881.  There, even though in-person statements made by company executives occurred within days of filings that contained cautionary language, the "defendants [did] not contend that [the speaker] specifically cautioned that listeners should refer to those documents for appropriate cautionary warnings."  Id. at 882.  Therefore, the court surmised that it was possible that a reasonable investor could see or hear such statements, not seeing or hearing any indication that cautionary warnings exist, would fail to read the documents that contained the cautionary language.  Id.

Such is also the case here.  Because there is no evidence that Waldman's statements at the conference were accompanied by meaningful cautionary language, the Court is unable to

United States District Court
Northern District of California

1  conclude, at this stage, that his statement properly falls within the PSLRA's safe harbor. [7]

2      However, though the statements do not fall within the PSLRA's safe harbor, Plaintiffs

3  have failed to plead with particularity facts to suggest that the statements were false or misleading

4  when made.  The AC does not allege that Waldman did not believe his own projections, nor does

5  it contain information to suggest that he had no reasonable basis to believe his statement.

6  Moreover, Plaintiffs have failed to allege facts to suggest that Waldman did not believe his own

7  underestimate or had no reasonable basis to make such an estimate.  Accordingly, any claims

8  based on this statement fail to plead falsity under the PSLRA's heightened pleading requirement.

9      Plaintiffs' claims stemming from Waldman's statements concerning the continued

10  deployment of supercomputers and the company's current "large deals" similarly fail.  The AC

11  does not allege facts to suggest that Waldman's statements were false when made.  Besides the

12  business generated by Intel's Romley rollout, Mellanox also realized revenue from the launch of

13  the "Sandy Bridge" server platform, AC ¶ 64, 68, and it generated at least $17 million dollars in

14  Q3 from Polywell computers, which represented nearly 11% of the company's Q3 revenue.  AC ¶

15  96, 99.  Plaintiffs' argument based on statements regarding Waldman's identification of large

16  deals on the horizon and his unremarkable observation that supercomputers will continue to be

17  manufactured despite Intel's product cycles is unpersuasive.  Not only does the AC fail to allege

18  that Waldman did not believe his own statements, it fails to allege that such statements were false

19  when made.

20  _____

21  [7] Defendants contend that when a plaintiff proceeds on a "fraud-on-the-market" theory, a
   defendant's cautionary statements must "be treated as if attached to every one of its oral and
22  written statements" requiring the Court to consider whether *any* cautionary language provided by
   the defendants *at any time* sufficiently warned of the risk of which plaintiffs complain.  ECF No.
23  81 at 14.  Defendants support this argument with two cases, one from the Eastern District of New
   York and another from the Seventh Circuit.
24
   The Court is aware of no Ninth Circuit authority that would allow the Court to consider all
25  cautionary statements made at any time as attaching to all statements made by Defendants,
   regardless of temporal proximity.  In fact, in Cutera, the Ninth Circuit analyzed the applicability
26  of the PSLRA's safe harbor by examining whether each allegedly misleading statement was
   accompanied by cautionary language.  In re Cutera, 610 F.3d at 1102.  This Court follows the
27  Ninth Circuit's reasoning in Cutera, and requires that each forward-looking statement be
   accompanied by cautionary language.
28

25

#### 4.      Statements Relating to Potential Competition from Intel

Plaintiffs further allege that various statements made by Defendants disregarding the potential competition Mellanox faced from Intel were false or misleading.  AC ¶ 67, 74. Defendants respond that Plaintiffs have failed to allege that Defendants' opinions regarding potential competition with Intel were both objectively and subjectively misleading.

The Ninth Circuit has determined that statements which "are alleged to be misleading opinions, not statements of fact . . . can give rise to [a securities violation] only if the complaint alleges with particularity that the statements were both objectively and subjectively false or misleading."  Rubke v. Capitol Bancorp Ltd., 551 F.3d 1156, 1162 (9th Cir. 2009).

Plaintiffs contend that Waldman's statement during Mellanox's 1Q12 earnings call that "we think it's going to take several years for Intel until they improve the architecture or microarchitecture of things and even solution and come with something that's competitive" was false or misleading because "Defendants knew that Intel was poised to develop its own InfiniBand product."  AC ¶ 65, 67.  Plaintiffs similarly contend that Waldman's statement at a May 7, 2012 conference that "[w]e believe it's going to take [Intel] at least two, three years to get their silicon out, and then one or two more years to get their software on top of that" was false or misleading for the same reason.  AC ¶ 69, 74.

Plaintiffs' claims based on these statements fail for a number of reasons.  First, the AC fails to allege that either Mellanox or any individual Defendant believed that the timetable regarding Intel's ability to compete was false.  Although the complaint alleges that "Mellanox relied heavily upon a long-standing partnership with . . . Intel," that "Defendant Waldman had worked at Intel," and that he "maintained a close relationship with Intel," such allegations are a far cry from pleading subjective falsity—that Waldman actually disbelieved his own projection. Plaintiffs also place great weight on evidence that Waldman maintained a close relationship with Intel and had knowledge of Intel's business.  At best, this evidence supports a theory that Waldman "may have known" or "should have known" Intel's ability to compete with Mellanox, but such inferences fall short of alleging subjective falsity.

Second, Plaintiffs have failed to allege any facts to suggest that the statements in question

26

were false when made.  Plaintiffs apparently offer Waldman's statement that the company was "not into worrying [about] the picture with Intel" as evidence of the objective falsity of his statements regarding Intel's competitive ability.  Opp. at 13.  This statement has no bearing on whether the challenged statements were objectively false when made and was actually offered in response to a question about "Intel's pre-announcement," rather than Intel's future competitive outlook.  See Regoli Decl., Ex. 10 at 5.

Finally, Plaintiffs have failed to allege facts suggesting that Waldman's opinion about Intel's ability to compete turned out to be incorrect.  In other words, not only are the statements not alleged to have been false when made, there are no allegations from which the Court conclude that they were ever false.  It is true that Plaintiffs have alleged "persistent rumors" that Intel was making substantial progress on its own InfiniBand product.  AC ¶ 53.  However, rumors are not enough to show that Waldman's opinion was objectively false.  See In re Vertex Pharms., Inc., Sec. Litig., 357 F. Supp. 2d 343, 354 (D. Mass. 2005) ("Mere rumors cannot . . . satisfy the requirement that the facts alleged 'provide an adequate basis for believing that the defendants' statements were false.'") (quoting In re Cabletron Sys., Inc. 311 F.3d 11, 29 (1st Cir. 2002)). There is no suggestion in the complaint that Intel released a competitor product, or that Waldman's opinion was otherwise objectively false.

Accordingly, Plaintiffs' allegations concerning Defendants' statements about potential competition from Intel cannot support their securities claims.

### 5.     Omissions Regarding Inventory Buildup at HP and Delays in Shipping Cables

In their Amended Complaint, Plaintiffs contend that various statements made during the Class Period were false or misleading because Defendants knew there was an inventory buildup at HP and that Mellanox was experiencing significant delays in shipping some of its fiber-optic cables to its customers.  AC ¶¶ 80, 82, 90.  However, in their Opposition, Plaintiffs contend that Defendants had the *affirmative duty to disclose* the inventory buildup at HP and Mellanox's chronic delays in shipping cables.  Opp. at 10–12.

Section 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and all

United States District Court
Northern District of California

material information.  Matrixx Initiatives, Inc. v. Siracusano, 131 S. Ct. 1309, 1321 (2011).

Disclosure is required only when necessary "to make . . . statements made, in the light of the

circumstances under which they were made, not misleading."  Id. (quoting 17 C.F.R. § 240.10b–

5(b)).  Consequently, "[e]ven with respect to information that a reasonable investor might consider

material, companies can control what they have to disclose under these provisions by controlling

what they say to the market."  Id. at 1322.

Plaintiffs have failed to specifically allege which statements were rendered false or

misleading by Defendants' failure to disclose the inventory buildup at HP.  In the AC, plaintiffs

list the HP inventory buildup as one of the five reasons that rendered misleading Defendants

statements that they had not experienced a "one-quarter wonder" and that they were "comfortable

with [their] long-term model."  AC ¶ 90.  Plaintiffs have not explained why such statements were

rendered false or misleading even assuming Defendants had knowledge of the inventory buildup.

Furthermore, Plaintiffs have not adequately alleged that Defendants had actual knowledge of the

inventory buildup at HP.  Merely offering Waldman's comment that the company generally has

"visibility into [its] OEMs" fails to allege scienter with the requisite particularity, as discussed in

more detail below.[8]

The same is true for any alleged omission regarding delays in shipping cables.  Plaintiffs

suggest a laundry list of statements that were rendered allegedly false or misleading by

Defendants' knowledge and omission of chronic delays in shipping cable orders to its largest

customers.  AC ¶ 80, 82, 90.  However, Plaintiffs have not explained why any statements were

rendered false or misleading by the failure to report the shipping delays.  Confusingly, Plaintiffs

offer the statements of a confidential witness, who explained that "from April to September 2012,

there were significant delays" in shipping cables.  AC ¶ 38.  However, Mellanox did not

experience its revenue shortfall until 4Q12, suggesting that its revenue continued to grow during

2Q12 and 3Q12 despite the purported shipping delays.

---

[8] Beside the fact that this remark is not nearly enough to allege scienter, Mr. Waldman made this
comment as a preface to his explanation that the company did not have visibility into HP because
of a personnel change. Ex. 16 at 5.

United States District Court
Northern District of California

For the reasons discussed above, Plaintiffs have failed adequately to allege that Defendants made any misleading statements or omissions that were material and false.  Consequently, Plaintiffs' claims must be dismissed.

**B.     Scienter**

Plaintiffs' failure to adequately plead falsity makes it unnecessary for the Court to consider the sufficiency of the allegations of scienter.  Karacand v. Edwards, 53 F. Supp. 2d 1236, 1252 (D. Utah 1999) ("Where, as here, plaintiffs have not adequately pleaded falsity, it is unnecessary to determine whether they have adequately pleaded scienter. Where plaintiffs fail to plead falsity, *a fortiori* they have not established that defendants knew those statements were false.").  Nonetheless, for the reasons set forth below, the Court finds, as an alternative basis for dismissal, that the Amended Complaint fails adequately to plead scienter.

The Amended Complaint appears to set forth four categories of allegation to demonstrate a strong inference of scienter: (1) the nature of Mellanox's customer set; (2) Defendants' "visibility into [its] OEMs"; (3) Defendants' "hands on" management style; and (4) stock sales by individual Defendants.

**1.     Nature of Mellanox's Customer Set**

Plaintiffs argue that Defendants knew or recklessly disregarded that the growth it achieved during the first three quarters of 2012 was not sustainable.  As proof of Defendants' knowledge, Plaintiffs point to the fact that Mellanox only had a "small number of customers" who "account[ed] for a significant portion" of its business.  AC ¶ 2; Opp. at 18.  Plaintiffs also highlight that Waldman publicly acknowledged that the company was working closely with Intel. AC ¶¶ 4, 37, 94.

These facts do not allege falsity with the required specificity.  Though Plaintiffs claim that Defendants knew that "the Romley upgrade-induced cycle would quickly dissipate in late 2012 because it was singularly tied to Intel's Romley platform," Mellanox and its executives repeatedly acknowledged the "one-time" nature of the demand from the Romley rollout.  Moreover, the Amended Complaint and the other related documents are fraught with examples of "non-Romley" business opportunities for Mellanox.  That Mellanox's business relied on a small number of

customers and that the company worked closely with Intel do not establish that Defendants knew Mellanox's projections were unattainable or that its growth would be short-lived.

### 2. Defendants' Visibility into its OEMs

Plaintiffs next contend that Waldman's contentions that the company "ha[s] pretty good visibility into [its] OEMs" and is "also pretty close to the end customers in some locations, definitely the big ones" show that Defendants knew about the inventory buildup at HP and that the company's growth was not sustainable. Opp. at 20. However, these statements fail to allege the necessary strong inference of scienter because, even if true, they merely provide that the company "should have known" or "could have known" about the buildup. See In re Splash, 160 F. Supp. 2d at 1179 (finding that a bare allegation that managers were in "constant contact" with customers and had "direct access" to information from them was insufficient to infer scienter).

### 3. Defendants' "hands-on" Management Style

Plaintiffs identify four confidential witnesses who allegedly support the contention that several of the individual Defendants were "hands-on" managers who were "hyper-involved" in nearly every aspect of the company. AC ¶ 25–37. A complaint relying on statements offered by confidential witnesses to establish scienter must similarly satisfy the PSLRA's heightened pleading requirements: (1) "the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge"; and (2) the statements "[that] are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." Zucco Partners, 552 F.3d at 995.

The Court finds that Plaintiffs' allegations concerning Defendants' "hands-on" management style are insufficiently particular to satisfy the scienter requirement, because the allegations are merely generic allegations that a manager may have insight into certain areas of the business, rather than direct insight into the aspects of the business relevant to Plaintiffs' claims. General allegations of defendants' "hands-on" management style, their interaction with other officers and employees, their attendance at meetings, and their receipt of unspecified weekly or monthly reports are insufficient. See, e.g., In re Daou Sys., Inc., 411 F.3d 1006, 1022 (9th Cir.

2005) (citing In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1087 (9th Cir. 2002).

### 4. Defendants' Stock Sales

Plaintiffs argue that Defendants' stock sales during the Class Period give rise to a strong inference that Defendants knew of the frailties in Mellanox's earnings, but failed to disclose them. See AC ¶¶ 9, 59, 62–63.

"[N]ot every sale of stock by a corporate insider shows that the share price is about to decline." Ronconi v. Larkin, 253 F.3d 423, 435 (9th Cir. 2001). "'[I]nsider trading is suspicious only when it is 'dramatically out of line with prior trading practices *at times calculated to maximize the personal benefit from undisclosed inside information.*'" Id. (quoting In re Silicon Graphics, 183 F.3d at 986). To evaluate insider stock sales, the Ninth Circuit evaluates "(1) the amount and percentage of shares sold; (2) timing of the sales; and (3) consistency with prior trading history." Id.

The stock sales at issue were made pursuant to pre-existing 10b5-1 trading plans. The Ninth Circuit has held that stock sales made pursuant to pre-existing trading plans "do not by themselves support an inference of scienter." In re VeriFone, 704 F.3d at 704 n.2. However, in VeriFone, the stock sales also were not "out of line with prior trading volume." The stock sales alleged in the Amended Complaint were significantly larger than previous ones. For example, Waldman "sold over 67% more shares during the Class Period than in the same time frame preceding the Class Period." AC ¶ 60. Of course, the Amended Complaint also alleges that Mellanox's stock price reached all-time highs during the Class Period, which led, unsurprisingly, to increased stock sales by company officers.

Taken holistically, the stock sales themselves do not create a strong inference of scienter. Although they departed from previous sales volumes, they were mostly made pursuant to pre-existing trading plans, and they were made throughout the Class Period. That Mellanox's rise in stock price was coupled with a later fall does not render the sales made during the Class Period evidence of knowing fraud. Without some other indication of scienter, the Court declines to find that the stock sales alone could support Plaintiffs' claims.

C.      **Claims Pursuant to Section 20(a)**

Absent an underlying violation of the Security Exchange Act, there can be no control

person liability under Section 20(a).  <u>Paracor Fin., Inc. v. Gen. Elec. Capital Corp.</u>, 96 F.3d 1151,

1161 (9th Cir. 1996).  Accordingly, because Plaintiffs have not sufficiently pled a violation of

Section 10(b), all claims under Section 20(a) must also be dismissed.  <u>See</u> <u>Shurkin v. Golden State</u>

<u>Vitners Inc.</u>, 471 F. Supp. 2d 998, 1027 (N.D. Cal. 2006), <u>aff'd</u>, 303 Fed. Appx. 431 (9th Cir.

2008).

IV.     **CONCLUSION**

For the foregoing reasons, the Court hereby GRANTS Defendants' motion to dismiss.  The

Amended Complaint is hereby DISMISSED,[9] with leave to amend consistent with the terms of

this Order.  Within thirty days from the date of this Order, Plaintiffs shall file either their Second

Amended Complaint[10] or a notice of submission to the Court's Order dismissing the complaint,

resulting in a final judgment for Defendants.  Failure to file either an amended complaint or notice

of submission may result in dismissal for failure to comply with this Order.

**IT IS SO ORDERED.**

Dated: March 29, 2014

_____
JON S. TIGAR
United States District Judge

---

[9] Because the Court finds that Plaintiffs have failed adequately to allege materiality, falsity, or
scienter, the Court declines to address the issue of loss causation.

[10] The Court notes that Plaintiffs' 82-page, 163-paragraph Amended Complaint contains many
allegations that the Court has now found to be either non-actionable puffery or subject to the
PSLRA's safe harbor.  Further, the Amended Complaint is unclear as to which of Defendants'
representations are alleged to support Plaintiffs' claims, and which are included solely to provide
background information.  Plaintiffs are encouraged to bear these comments in mind should they
choose to file a Second Amended Complaint.